## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BLUEFIELD DIVISION

| | | |
|---|---|---|
| DEBORAH J. LAMBERT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 1:09-00703 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

### M E M O R A N D U M   O P I N I O N

This is an action seeking review of the decision of the Commissioner of Social Security denying Plaintiff's application for Disability Insurance Benefits (DIB), Supplemental Security Income (SSI), Widow's Insurance Benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401- 433, 1381-1383f. This case is presently pending before the Court on the parties' cross-Motions for Judgment on the Pleadings. (Document Nos. 18 and 21.), Both parties have consented in writing to a decision by the United States Magistrate Judge. (Document Nos. 3 and 4.)

The Plaintiff, Deborah J. Lambert (hereinafter referred to as "Claimant"), filed applications for DIB, SSI, and Widow's Insurance Benefits on February 24, 2006 (protective filing date), alleging disability as of January 16, 1991, due to epilepsy, back trouble, depression, and nerves. (Tr. at 14, 57-65, 109-10.) The claims were denied initially and upon reconsideration. (Tr. at 48-50, 52-54.) On September 21, 2006, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 44.) The hearing was held on March 20, 2007, before the Honorable Karen B. Peters. (Tr. at 295-323.) By decision dated April 20, 2007, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 14-23.) The ALJ's decision became the final decision of the

Commissioner on June 5, 2009, when the Appeals Council denied Claimant's request for review. (Tr. at 6-9.) On June 19, 2009, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5), a claimant for disability has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2007). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's

remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2007). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> (C) *Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of

the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[1] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental

---

[1] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since June 16, 1991, her alleged onset date. (Tr. at 17, Finding No. 3.) Under the second inquiry, the ALJ found that Claimant suffered from a seizure disorder and dysthmia, which were severe impairments. (Tr. at 17, Finding No. 4.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 17, Finding No. 5.) The ALJ then found that Claimant had a residual functional capacity for a limited range of medium exertional work, as follows:

> [T]he claimant has the residual functional capacity to perform a limited range of medium work. The claimant can lift or carry 25 pounds frequently, 50 pounds occasionally, and can sit, stand, or walk about 6 hours each in an 8 hour day. The claimant can perform occasional bending, stooping, crouching, crawling, balancing, and kneeling, but no climbing. The claimant has no visual, communicative, or manipulative limitations. Due to her seizure disorder, the claimant should avoid all exposure to heights and hazardous machinery. The claimant has no other environmental limitations. Due to a moderate reduction in concentration from depression, the claimant is limited to simple, non-complex tasks.

(Tr. at 20, Finding No. 6.) At step four, the ALJ found that Claimant had no past relevant work. (Tr.

5

at 22, Finding No. 7.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a cleaner/janitor and an order filler, at the light and medium levels of exertion. (Tr. at 23-24, Finding No. 11.) On this basis, benefits were denied. (Tr. at 23, Finding No. 12.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

Claimant's Background

Claimant was born on January 21, 1956, and was 51 years old at the time of the administrative hearing, March 20, 2007. (Tr. at 22, 57, 63, 298.) The record contained inconsistent statements regarding Claimant's education, but for purposes of the decision, the ALJ determined that

6

Claimant had less than a high school education, or a limited education, and was able to communicate in English. (Tr. at 22, 115, 162, 318.) Claimant had no past relevant work. (Tr. at 22, 110, 318.)

The Medical Record

The Court has reviewed all the evidence of record, including the medical evidence, and will discuss it below in relation to Claimant's arguments.

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ erred in (1) analyzing Claimant's seizures and rejecting the opinion of Claimant's treating physician, Dr. Merva; and (2) rejecting the opinion of the consultative examiner, Teresa Jarrell, M.A., regarding Claimant's mental impairments. (Document No. 19 at 8-11.) The Commissioner asserts that Claimant's arguments are without merit and that substantial evidence supports the ALJ's decision. (Document No. 21 at 8-12.)

Analysis.

Opinion Evidence.

Claimant first alleges that the ALJ erred in analyzing Claimant's seizures and rejecting the opinion of her treating physician, Dr. Merva. (Document No. 19 at 8-9.) Specifically, she asserts that the ALJ erred in giving great weight to the opinions of the State agency medical experts because their opinions were consistent with the evidence from the treating physicians, when Dr. Merva, whose opinion the ALJ rejected, was Claimant's treating physician. (Id. at 8.) She further asserts that the ALJ erred in finding Dr. Merva's opinion to have been inconsistent with his progress notes. (Id. at 8-9.) Claimant contends that the information addressed in his opinion, the physical RFC assessment regarded issues that normally would not be addressed in progress notes. (Id. at 9.)

Finally, Claimant asserts that though the ALJ indicated Claimant saw Dr. Merva every three to six months, the progress notes indicate that he saw Claimant more frequently when she was having problems with seizures, auras, or balancing. (Id.)

In response, the Commissioner asserts that the ALJ properly found that Dr. Merva's opinions were contradicted by his progress notes and objective findings, and that Claimant did see Dr. Merva every three to six months. (Document No. 21 at 10.) The Commissioner further asserts that the progress notes indicated that Claimant's seizures were well-controlled with medications; that she reported only occasional minor seizures and auras; and that neurological examinations, electrocardiograms ("EKGs"), and holter monitor reports were normal. (Id.)

Claimant next alleges that the ALJ erred in rejecting the opinion of Ms. Jarrell. (Document No. 19 at 9-11.) Claimant asserts that the only evidence inconsistent with Ms. Jarrell's opinion was that of the two non-examining State agency medical consultants, whose opinions were rendered prior to the MMPI results. (Id. at 11.) The Commissioner asserts that the ALJ properly determined that Ms. Jarrell's opinion was not supported by Claimant's activities of daily living, the progress notes of treating physicians, and the opinions of the examining and reviewing medical experts. (Document No. 21 at 10-11.) The Commissioner points out that the treating physician's notes to which the ALJ referred, were those of Dr. Merva. (Id. at 11.) Thus, the Commissioner contends that Claimant's argument is without merit and that substantial evidence supports the ALJ's decision. (Id. at 11-12.)

At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." See Social Security Ruling 96-8p,

61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2007). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." Id. "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the Commissioner. The Regulations state that:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

See 20 C.F.R. § 416.927(e)(2) (2007).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do. That is, the SSA need not accept only physicians' opinions. In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The Regulations state that opinions on these issues are not medical opinions as described in the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2)); rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and 416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner. . . ." Id. §§ 404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your residual functional capacity rests with the Administrative Law Judge or Appeals Council." See 20 C.F.R. §§ 404.1545 and 416.946 (2007). However, the adjudicator must still apply the applicable factors in 20 C.F.R. § 416.927(d) when evaluating the opinions of medical sources on issues reserved to the Commissioner. See Social Securing Ruling ("SSR") 96-5p, 61 FR 34471, 34473 (1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical source statement,' which is a 'statement about what you can still do despite your impairment(s) made by an individual's medical source and based on that source's own medical findings." Id. SSR 96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s)." Adjudicators "must weigh medical source statements under the rules set out in

10

20 C.F.R. § 416.927, providing appropriate explanations for accepting or rejecting such opinions." Id. at 34474.

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2007). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Id. §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and 416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency psychological consultants.

11

20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2007). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2007). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2007). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2007). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the Commissioner's conclusions are rational. Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

1. Dr. Merva.

The evidence of record indicates that Claimant suffered a seizure disorder since the age of

12

five, and was treated by Dr. William A. Merva, M.D., for the disorder from 1995 through March 2007. (Tr. at 169-72, 174-215, 270-74, 275-78, 292.) On March 23, 1995, Dr. Merva noted that Claimant had been seizure free except in December 1994, when she was under a lot of stress regarding her daughter. (Tr. at 17, 215.) Claimant's seizure disorder was treated with Dilantin, Depakote, Phenobarbital, and Neurontin. (Id.) On March 25, 1996, Dr. Merva noted that except for a few auras before her menstrual cycle, she had been seizure free for one year. (Tr. at 17, 214.) Dr. Merva indicated that Claimant's seizures had "much diminished since starting Neurontin." (Tr. at 214.) On April 25, 1996, Dr. Merva noted that Claimant had been seizure free on her medications. (Tr. at 17, 213.) Neurological examination on May 30, 1996, essentially was normal. (Tr. at 17, 212.) On September 4, 1996, Dr. Merva reported that since having been on Neurontin, Claimant's seizures had "markedly improved." (Tr. at 17, 211.) A 24-hour Holter monitor EKG showed basically a normal sinus rhythm (Tr. at 17, 210.), and on September 16, 1996, Dr. Merva increased her Neurontin and reported that her seizures were "almost completely eradicated." (Tr. at 17, 209.)

Dr. Merva noted on March 17, 1997, that Claimant was doing well, felt great, and had been completely seizure free. (Tr. at 17, 208.) In September 1998, Dr. Merva reported that Claimant was seizure free since last year and directed that she return in one year. (Tr. at 17, 207.) On February 1, 1999, Dr. Merva reported that Claimant had a brief seizure (Tr. at 17, 203.), but one week later, reported no seizures. (Tr. at 17, 201.) On December 16, 1999, Dr. Merva reported that Claimant had been seizure free (Tr. at 17, 198.), and on June 21, 2000, he indicated an essentially normal neurological examination. (Tr. at 17, 197.) Dr. Merva reported on August 7, 2001, that Claimant's seizures were "under excellent control." (Tr. at 17, 196.) On January 14, 2002, Claimant had developed an essential tremor, which she believed was due to stress from her husband's illness. (Tr.

at 17, 193.) On May 31, 2002, Dr. Merva reported that Claimant was seizure free. (Tr. at 17, 190.) Claimant reported on September 3, 2002, that she had no major seizures, but had some small seizures. (Tr. at 17, 189.) Dr. Merva increased her medications. (Id.) On December 3, 2002, and April 3, 2003, there were no significant findings on neurological examination. (Tr. at 187-88.)

On April 8, 2003, Dr. Merva reported that Claimant's EEG was normal and that she had no further seizure. (Tr. at 17, 183, 186.) On October 8, 2003, Dr. Merva reported that Claimant had been seizure free since March 2003. (Tr. at 17, 182.) On April 8, 2004, Dr. Merva again indicated that Claimant was seizure free and was "doing well." (Tr. at 17-18, 179.) Claimant reported on July 13, 2004, that she was "off balance," and she was unable to walk tandemly on exam. (Tr. at 178.) On July 21, 2004, Dr. Merva reported that she had been seizure free and was directed to return in six months. (Tr. at 18, 177.)

On March 8, 2006, Claimant reported having had a few black out spells, which occurred in a series. (Tr. at 18, 174.) An EEG on September 28, 2006, was normal. (Tr. at 18, 274.) On October 5, 2006, and November 2, 2006, Dr. Merva reported that Claimant had small seizures, but did not want to change her medications. (Tr. at 18, 270-71.) Claimant reported on November 2, 2006, that she was doing well. (Tr. at 18, 270.) Finally, on March 1, 2007, Dr. Merva reported that Claimant felt tired and had some seizures, but did not want to undergo an EEG because she could not afford it. (Tr. at 18, 292.)

Dr. Merva completed a form Seizure RFC Questionnaire on February 19, 2007, on which he opined that Claimant was incapable of performing even low stress jobs. (Tr. at 18, 21-22, 275-78.) Dr. Merva indicated that Claimant averaged one seizure per week, and required one or two days of rest before returning to work. (Tr. at 18, 275, 278.) He further opined that Claimant would likely

14

be absent from work three days per month. (Tr. at 18, 278.)

On May 4, 2006, Dr. David Deyerle, M.D., completed a form Physical RFC Assessment on which he opined that Claimant was capable of performing a limited range of work-related activities at all exertional levels. (Tr. at 18, 222-29.) Dr. Deyerle opined that Claimant could occasionally climb ramps and stairs, but never ladders, ropes, or scaffolds. (Tr. at 18, 224.) Likewise, she could not balance. (Id.) Dr. Deyerle noted that Claimant took over-the-counter pain medications, but that there was no indication of significant physical limitations. (Tr. at 18, 229.) He opined that her condition basically was "nonsevere from some restrictions due to seizure precautions." (Id.) Nevertheless, he noted that her seizure disorder appeared under "pretty good control with medications most of the time." (Id.)

Dr. A. Rafael Gomez, M.D., completed a further Physical RFC Assessment on July 25, 2006, on which he, too, opined that Claimant was capable of performing a limited range of work-related activities at all exertional levels. (Tr. at 18, 262-69.) The only assessed limitations included never climbing ladders, ropes, or scaffolds or balancing and avoiding concentrated exposure to vibration, fumes, odors, dusts, gases, and poor ventilation. (Tr. at 18, 264, 266.) Dr. Gomez noted that since Dr. Deyerle's RFC assessment, Claimant had experienced only four seizures in the last six months and six seizures in the last year. (Tr. at 18, 267.) Accordingly, Dr. Gomez opined that the new evidence did not warrant a change in Dr. Deyerle's assessment. (Id.)

In her decision, the ALJ rejected Dr. Merva's opinions because his answers to the questionnaire were contradicted by his office progress notes and objective findings. (Tr. at 18, 22.) The ALJ noted that his progress notes indicated that Dr. Merva saw Claimant only every three to six months and that Claimant's seizures were well-controlled with medications and that she had

reported only occasional minor seizures and auras. (Tr. at 21-22.) The ALJ accorded great weight to the opinions of the State agency medical experts, Dr. Deyerle and Dr. Gomez because their opinions were "consistent with the evidence in file from treating physicians." (Tr. at 22.)

Claimant takes issue with the ALJ's explanation for according greater weight to the State agency medical experts' opinions than to his treating physician. Claimant correctly points out that Dr. Merva was her only treating physician regarding her seizure disorder, and that the ALJ rejected the opinions of Dr. Merva. Nevertheless, it is clear that the ALJ was referring to the consistency between Dr. Merva's progress notes and the State agency medical experts' opinions, and not to Dr. Merva's opinions, which she rejected. To this extent, substantial evidence supports the ALJ's finding that the State agency medical experts' opinions were consistent with Dr. Merva's progress notes. The notes reflected that Claimant's seizures were well controlled with medications and were primarily small seizures. Furthermore, though Claimant experienced some black out spells and small seizures, she did not want her medications changed. Despite these episodes, Dr. Merva neither indicated any significant findings on neurological examinations during his treatment of Claimant, nor assessed any limitations from her seizures. There is no indication that he ever advised her against performing any work-related activity, or any activity due to her seizures. Claimant alleges that a physician should not be expected to address such "employment issues" in a progress note. The Court finds however, that in the absence of evidence indicating any restricted activity or complaints of inability to perform any activity because of her seizure disorder, it was reasonable for the ALJ to find that the State agency medical experts' opinions were supported by Dr. Merva's progress notes. Dr. Merva's notes consistently indicated that Claimant's condition had improved with medication and that she was doing well. Moreover, Claimant primarily saw Dr. Merva only once

every three to six months. Admittedly there were occasions when Claimant saw Dr. Merva more frequently when she had some small seizures, as Claimant points out. Nevertheless, the overall treatment record reflected routine visits every three to six months. To accommodate Claimant's seizure disorder, the ALJ, as did the State agency medical experts, assessed limitations in balancing, climbing, and exposure to heights and dangerous machinery. To the extent that concentration may have caused or contributed to her seizures, the Court notes that the ALJ also restricted Claimant to performing simple, non-complex tasks.

Accordingly, the Court finds that the ALJ evaluated the opinion evidence of record according to the Regulations, and that her decision to give greater weight to the State agency medical experts' opinions as opposed to Claimant's treating physician, and her assessment of Claimant's seizure disorder, is supported by substantial evidence. The Court further finds that Claimant's arguments therefore, are without merit.

2. <u>Ms. Jarrell</u>.

On October 10, 2006, Teresa E. Jarrell, M.A., a licensed psychologist, conducted a consultative evaluation of Claimant at the request of her attorney. (Tr. at 19, 22, 279-91.) On mental status exam, Ms. Jarrell noted that Claimant was alert, attentive, and cooperative, but appeared mildly anxious and depressed with a restricted affect. (Tr. at 19, 283.) Claimant's speech was non-spontaneous but was normal in rate and volume; her thought content was relevant to the questions asked of her, and was linear and goal-directed; and her immediate memory was normal but her recent and remote memory was mildly deficient. (<u>Id.</u>) Ms. Jarrell noted that Claimant's insight and judgment were within normal limits and she was oriented in all spheres. (<u>Id.</u>) Claimant indicated that she worried excessively and found it difficulty to control her worries, which were exacerbated by

17

stress. (Id.) MMPI-2 testing indicated that Claimant experienced a moderate level of emotional distress, perceived personal deficiencies and viewed herself as useless and no good at all, and was shy and introverted.  (Tr. at 19, 284-86.) Ms. Jarrell diagnosed major depressive disorder, recurrent, severe, without psychotic features; generalized anxiety disorder; and amnestic disorder, NOS; and assessed a GAF of 55. (Tr. at 19, 286.) She opined that Claimant was incapable of "responding appropriately to work pressures," and that Claimant highly was likely to decompensate under stress. (Tr. at 19, 287,) Ms. Jarrell considered Claimant's prognosis to be "quite guarded, given the severity of symptoms currently in evidence in spite of treatment with antidepressant medication." (Id.)

Ms. Jarrell also completed a form Mental RFC Assessment, on which she opined that Claimant was markedly limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; travel in unfamiliar places or use public transportation; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. at 19, 289-91.)

In addition to Ms. Jarrell, the record indicates that Claimant treated with Dr. Merva for depression. (Tr. at 19.)On April 25, 2002, Dr. Merva reported that the ER called and indicated Claimant had attempted to commit suicide by ingesting flea and tick spray. (Tr. at 192.) Claimant reported that she was no longer suicidal, but was depressed due to the difficulties of her husband's illness. (Id.) He started Claimant on Zoloft 50mg. (Id.) On May 7, 2002, Claimant's Zoloft was increased to 100mg and Dr. Merva noted that Claimant was "doing better." (Tr. at 191.) He reported on May 31, 2002, that her depression had improved. (Tr. at 190.) On February 22, 2005, Claimant requested that her Zoloft be reduced (Tr. at 176.), but actually was increased to 150 mg on August

24, 2005. (Tr. at 175.)

On March 17, 2006, Melinda M. Wyatt, M.S., a licensed psychologist, conducted a mental status examination of Claimant. (Tr. at 19, 216-20.) Ms. Wyatt noted that Claimant was cooperative and motivated, maintained adequate eye contact, exhibited relevant and coherent speech, and exhibited a depressed mood and restricted affect. (Tr. at 19, 218.) Claimant's thought content and process was organized and logical, her insight was adequate, and her judgment was average. (Id.) Ms. Wyatt noted that Claimant's immediate memory was within normal limits, her recent memory was markedly deficient, and her remote memory was impaired. (Tr. at 19, 218-19.) Her concentration and persistence were adequate and her social functioning was assessed as being within normal limits. Ms. Wyatt diagnosed dysthymic disorder and opined that Claimant's prognosis was fair. (Tr. at 19, 219.)

On May 6, 2006, Dr. Robert Solomon, Ed.D., completed a form Psychiatric Review Technique, on which he opined that Claimant's affective disorder was a non-severe impairment that resulted in no restrictions on activities of daily living; mild restriction in maintaining social functioning, concentration, persistence, and pace; and no episodes of decompensation each of extended duration. (Tr. at 19, 230-43.) Dr. Solomon opined that there was "no evidence of a severely disabling psych condition on or prior to 3/2006." (Tr. at 19, 242.)

On July 7, 2006, Dr. Holly Cloonan, Ph.D., likewise completed a form Psychiatric Review Technique, on which she opined that Claimant's dysthymic disorder resulted in mild restrictions of activities of daily living and maintaining social functioning; moderate limitations in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. at 19, 244-57.) Dr. Cloonan noted Claimant's reports that her depression interfered with her desire to socialize, but

acknowledged that she had family and friends on whom she depended for help. (Tr. at 19, 256.) Dr. Cloonan also completed a form Mental RFC Assessment on which she opined that Claimant was moderately limited in the following abilities: to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; interact appropriately with the general public; and accept instructions and respond appropriately to criticism from supervisors. (Tr. at 19, 258-60.) She further opined that Claimant was "able to learn and perform work-like activities, if not required to interact with the general public and/or a group of coworkers." (Tr. at 19, 260.)

    In her decision, the ALJ rejected Ms. Jarrell's conclusions because they were unsupported by Claimant's activities of daily living, the progress notes of her treating physician, and the opinions of the examining and non-examining medical experts. (Tr. at 22.) The Court finds that the ALJ's decision is supported by substantial evidence. Dr. Merva reported that Claimant was doing well, and Drs. Solomon and Cloonan, as well as Ms. Wyatt, all indicated that Claimant's mental impairments were non-severe. Though Claimant attempted suicide in April 2002 by ingesting four ounces of flea and tick killer as a result of her depression, her condition improved and the emergency room physician indicated that the amount she ingested was harmless. (Tr. at 165-66, 192.) Furthermore, as the ALJ noted, Claimant's activities undermined Ms. Jarrell's opinions. The ALJ noted that Claimant got her granddaughter off to school in the mornings, used a home computer, read the Bible by herself and with her granddaughter, watched television, paid bills, made coffee, talked to friends, and laid down during the day. (Tr. at 21, 242, 30-04, 308-09, 314-16.) Accordingly, the Court finds that the ALJ properly reviewed Ms. Jarrell's opinion and found that it was not entitled to great weight.

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision is supported by substantial evidence. Accordingly, by Judgment Order entered this day, the Plaintiff's Motion for Judgment on the Pleadings (Document No. 18.) is **DENIED**, Defendant's Motion for Judgment on the Pleadings (Document No. 21.) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this matter is **DISMISSED** from the docket of this Court.

The Clerk of this Court is directed to send a copy of this Memorandum Opinion to counsel of record.

ENTER: September 30, 2010.

R. Clarke VanDervort
United States Magistrate Judge